**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

DAYSI BASSO,

               Plaintiff,

v.                                           No. CIV 08-338 LFG

COMMISSIONER OF SOCIAL SECURITY,

               Defendant.

**<u>MEMORANDUM OPINION AND ORDER</u>**

     Plaintiff Daysi Basso ("Basso") invokes this Court's jurisdiction under 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security ("Commissioner"). The Commissioner determined that Basso was not eligible for disability insurance benefits ("DIB"). Basso moves this Court for an order reversing the Commissioner's final decision, or alternatively, to remand for a rehearing. [Doc. Nos. 13, 14.]

     Basso was born on January 9, 1960 and was 47 years old when the administrative hearing was held. [Tr. 57, 58, 211.] In 1996, she attained a Master's Degree or the equivalent in bilingual education. [Tr. 211.] Basso' past relevant work experience is as an English as a Second Language (ESL) instructor in elementary public school. She worked in that position from 1991 to March 2005. [Tr. 62, 63, 64.] She is married and has a son who was five years old when she applied for benefits. [Tr. 75, 76.] Basso and her family live in Santa Fe. Her husband is a teacher who earns about $40 to $45,000 a year. Basso receives disability retirement from the State Education Board, in the amount of about $919.00 a month. [Tr. 212.]

On August 24, 2005, Basso applied for disability benefits, alleging an onset date of March 2, 2005, when she had a car accident.[1] [Tr. 58, 62.] Basso was driving when her vehicle was suddenly hit from behind resulting in her car being pushed under a truck in front of her. [Tr. 161.] She may have initially suffered a whiplash injury, but ultimately, she never returned to work due to allegations of neck and lower back pain, five "burst" discs, and vision problems. [Tr. 62-63.]

Basso's application for disability benefits was denied at the initial and reconsideration stages, and she sought timely review from the ALJ. [Tr. 26, 28, 29, 34, 36, 41, 71.]  An administrative hearing was held in Albuquerque, New Mexico on September 18, 2007, at which Basso and her attorney appeared by video teleconference while in Santa Fe. [Tr. 18, 209.]  In a decision, dated September 27, 2007, the ALJ found that Basso was not disabled within the meaning of the Social Security Act ("the Act") and denied the benefit request.  Basso challenged this determination to the Appeals Council which denied her request for review on February 27, 2008.  [Tr. at 3.]  This appeal followed.

### Standards for Determining Disability

In determining disability, the Commissioner applies a five-step sequential evaluation process.[2]  The burden rests upon the claimant to prove disability throughout the first four steps of this process, and if the claimant is successful in sustaining her burden at each step, the burden then shifts to the Commissioner at step five.  If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends.[3]

---

[1]Basso's application for benefits states that she seeks Supplemental Security Income benefits under Title XVI. [Tr. 58.] However, the ALJ's decision and Defendant's response stated her application was for DIB. [Doc. 15; Tr. 11.]

[2]20 C.F.R. § 404.1520(a)-(f) (1999); Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988).

[3]20 C.F.R. § 404.1520(a)-(f) (1999); Sorenson v. Bowen, 888 F.2d 706, 710 (10th Cir. 1989).

Briefly, the steps are: at step one, claimant must prove she is not currently engaged in substantial gainful activity;[4] at step two, the claimant must prove her impairment is "severe" in that it "significantly limits [her] physical or mental ability to do basic work activities . . . .,"[5] at step three, the Commissioner must conclude the claimant is disabled if she proves that these impairments meet or are medically equivalent to one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App. 1 (1999);[6] and, at step four, the claimant bears the burden of proving she is incapable of meeting the physical and mental demands of her past relevant work.[7]  If the claimant is successful at all four of the preceding steps, the burden shifts to the Commissioner to prove, at step five, that considering claimant's residual functional capacity ("RFC"),[8] age, education and past work experience, she is capable of performing other work.[9]  If the Commissioner proves other work exists which the claimant can perform, the claimant is given the chance to prove she cannot, in fact, perform that work.[10]  Here, the ALJ made his determination of non-disability at step four.

## Standard of Review

On appeal, the Court considers whether the Commissioner's final decision is supported by substantial evidence, and whether the Commissioner used the correct legal standards.  Langley v.

---

[4]20 C.F.R. § 404.1520(b) (1999).

[5]20 C.F.R. § 404.1520(c) (1999).

[6]20 C.F.R. § 404.1520(d) (1999).  If a claimant's impairment meets certain criteria, that means her impairment is "severe enough to prevent [her] from doing any gainful activity."  20 C.F.R. § 416.925 (1999).

[7]20 C.F.R. § 404.1520(e) (1999).

[8]One's RFC is "what you can still do despite your limitations."  20 C.F.R. § 404.1545(a).  The Commissioner has established RFC categories based on the physical demands of various types of jobs in the national economy.  Those categories are: sedentary, light, medium, heavy and very heavy.  20 C.F.R. § 405.1567 (1999).

[9]20 C.F.R. § 404.1520(f) (1999).

[10]Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991).

3

Barnhart, 373 F.3d 1116, 1118 (10th Cir. 2004).  To be substantial, evidence must be relevant and sufficient for a reasonable mind to accept it as adequate to support a conclusion; it must be more than a mere scintilla, but it need not be a preponderance.  Doyal v. Barnhart, 331 F.3d 758, 760 (10th Cir. 2003); Langley, 373 F.3d at 1118; Hamlin v. Barnhart, 365 F.3d 1208, 1214 (10th Cir. 2004). The Court's review of the Commissioner's determination is limited.  Hamilton v. Sec'y of HHS, 961 F.2d 1495, 1497 (10th Cir. 1992).  The Court may not substitute its own judgment for the fact finder, nor re-weigh the evidence.  Langley, 373 F.3d at 1118; Hamlin, 365 F.3d at 1214; Hargis v. Sullivan, 945 F.2d 1482, 1486 (10th Cir. 1991).  Grounds for reversal also exist if the agency fails to apply the correct legal standards or to demonstrate reliance on the correct legal standards. Hamlin, 365 F.3d at 1114.

It is of no import whether the Court believes that a claimant is disabled.  Rather, the Court's function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision and whether the correct legal standards were applied.  Hamilton, 961 F.2d at 1497-98.  In Clifton v. Chater, the Tenth Circuit described, for purposes of judicial review, what the record should show:

> The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence.  Rather, in addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as the significantly probative evidence he rejects.

Clifton v. Chater, 79 F.3d 1007, 1009-1010 (10th Cir. 1996) (internal citations omitted).  If supported by substantial evidence, the decision of the Commissioner is conclusive and must be affirmed.

After reviewing Basso's medical records, symptoms and complaints, the ALJ rejected her claim for benefits at step four, concluding that Basso was capable of performing her past relevant work as an ESL public school teacher.  In so deciding, the ALJ relied testimony of a vocational expert (VE). [Tr. at 16.] The ALJ made the following findings: (1) Basso had not engaged in substantial gainful activity since her alleged onset of disability; (2) she had severe impairments consisting of fibromyalgia, depressive disorder and "multiple body strains and discomforts;" (3) the severe impairments did not meet or medically equal any of the listed impairments, in particular 1.02 (major dysfunction of a joint) and 12.04 (affective disorders); (4) after consideration of the entire record, the ALJ determined that Basso had the RFC to perform light work except for occasional postural movements, including climbing, balancing, stooping, kneeling, crouching or crawling, and with moderate limitations in concentration, persistence or pace, defined as needing a 30-60 second break every 10-15 minutes; (5) Basso's allegations of debilitating pain were not entirely credible (6) the treating physicians' or care providers' letters regarding Basso's conditions were afforded minimal weight or no weight; (7) Basso was capable of performing her past relevant work based on Basso's RFC and the physical and mental demands of that work, as defined by the DOT; and (8) Basso was not under a disability from March 2, 2005 through the date of the ALJ's decision. [Tr. 13-17.]

In this appeal, Basso argues that the ALJ's RFC finding at phase one of step four was legally erroneous and not substantially supported for several reasons.  In addition, she asserts that the ALJ's mental RFC finding was not supported by any medical or psychological evidence and that the ALJ's credibility findings were not supported by substantial evidence.  Basso further contends that the ALJ erred at phases two and three of step four in failing to find the specific demands of work as a

teacher, to compare those demands with the RFC finding and to support the analysis with vocational evidence. [Doc. 14.]

The Commissioner argues generally that substantial evidence supports the final decision and that the ALJ applied correct legal standards in the evaluation of the evidence. [Doc. 15.]

### Summary of Basso's History and Medical Care

Basso's medical records begin in 2005 after she had the car accident on March 2, 2005. [Tr. 172.]   Prior to that date Basso was employed for many years as an elementary school ESL instructor.  She received exceptional teacher evaluations for the last 16 years of her employment. [Tr. 81.]

### 2005 Medical Records

On March 9, 2005, Basso was seen for physical therapy at NovaCare Rehabilitation, at the referral of her primary care physician, Anthony Quay.[11] [Tr. 172.] On March 9, a week after her car accident ("MVA"), Basso was suffering from right shoulder pain, discomfort in her neck, pain down the arm, tingling in her right hand, "stabbing" pain in her back, and cramping in her leg.  According to the therapy record, Dr. Quay had given her a sling to wear for her arm.  Basso complained that the pain was worse since the accident, and that she was sleeping on her back with a pillow under her right arm.  Her sleep had worsened due to pain.  She had not been able to work since the accident and was unable to do housework or to cook.  She was taking Synthroid (thyroid medication), a pain medication and a muscle relaxant.  X-rays taken of her shoulder and neck were negative.  On examination, Basso felt pain during all range of motion (ROM) testing.  She had increased pain in her cervical, thoracic and lumbar spine that the therapist noted was consistent with a MVA whiplash

---

[11]For some reason, Dr. Quay's medical records from this period of time are not part of the record.

injury.  Basso did not tolerate ROM testing of the upper extremity nor strength testing.  She needed skilled physical therapy to decrease her pain, and increase her ROM and strength.  The therapist believed her rehabilitation potential was good.  Basso was to be seen three times a weeks for two weeks and then reassessed. [Tr. 172, 176.] It appears that Basso followed through with her physical therapy appointments and treatment. [Tr. 176.]

On April 14, 2005, Basso had an appointment with Dr. Belyn Schwartz of Rehabilitation Medicine Associates of Northern New Mexico. Dr. Schwartz is a pain specialist, to whom Dr. Quay referred Basso. [Tr. 161.]  Dr. Schwartz evaluated Basso for her complaints of pain following the MVA.  Basso described the car accident and said she felt extremely fear and nervous after it happened.  She was checked by paramedics at the scene and told to follow up with her primary care physician (PCP).  According to Dr. Schwartz's record, Dr. Quay ordered x-rays of Basso's neck, back and shoulder on the day of the MVA which were negative.  However, Basso noticed that her right arm became very numb and heavy feeling.  An MRI of her neck and back was ordered on 4/9/05, that revealed multilevel disc protrusions[12] including a small central disc protrusion at C3-4, a small right paracentral disc protrusion that impressed upon the thecal sac at C4-5, a small left paracentral hard disc protrusion that impressed upon thecal sac at C5-6 and a broad central disc protrusion that impressed upon the thecal sac at C6-7.  There was no severe neural impingement except at C4-5 where there was some impression upon the ventral cervical.  No disc herniations were found in the lumbar spine, nor any spinal stenosis.  But, there was some mild facet arthritis noted at L4-5 and L5, S1 levels bilaterally with a small synovial cyst extending posterolaterally from the right L4-5 facet joint.

---

[12]It later disability statements by Basso, she claimed she had multiple "burst" discs.  She may be referring to these MRI results which discussed protruding or bulging discs.

Although this description of the MRI results is contained in Dr. Schwartz's notes, no MRI test results are included in the record.  Basso noted that physical therapy at NovaCare had helped some.  Initially, she said everything was so painful that she had to wear a sling on her arm for six weeks.  Her neck pain at this time was nearly resolved.  She suffered from ongoing shoulder pain in the range of 2 to 6 out of 10, which she rated as a 2 with medications.  The pain extended into Basso's forearm.  She denied numbness and tingling in the arms.  Her lower back pain was a 2 to 4 of 10, and a 6 without medications.  The pain in her lower back radiated to her sides. [Tr. 161.] Basso was taking Ibuprofen, Hydrocodone[13] and Lorazepam.[14]

Basso reported to Dr. Schwartz that she had not worked since her accident but would like to be cleared to return to work on the following Monday. [Tr. 162.] On exam, Dr. Schwartz noted that Basso's left hip was slightly lower than the right.  Her shoulders were symmetric.  She showed fairly good ROM in the cervical and lumbar areas.  She could heel and toe walk and raise her arms overhead.  She exhibited full strength in all of the major muscle groups of her arms and legs. Extension and rotation caused pain in her lower back.  She was tender in the lower back to the midline and laterally over L4-5, L5, and S1 regions.  She appeared to have cervicothoracic lumbar sprain/strain symptomatology.  Dr. Schwartz recommended she consider more physical therapy and facet joint injections to the lumbar spine.  Basso could be cleared to work for April 25, 2005, but she was advised to avoid sudden movements. [Tr. 163, 197.]

---

[13]Hydrocodone is a narcotic pain reliever (opiate-type) that acts on certain centers in the brain to give you pain relief.  www.webmd.com

[14]Lorazepam is a medication used to treat anxiety. Lorazepam belongs to a class of drugs known as benzodiazepines which act on the brain and nerves (central nervous system) to produce a calming effect. www.webmd.com

On April 14, 2005, NovaCare notes indicate Basso believed her right shoulder felt much better. [Tr. 176.] Basso was discharged from physical therapy on April 26, 2005. [Tr. 170.] On April 26, 2005, NovaCare records note that Basso stated her right shoulder was feeling better and that she was seeing her doctor later that day. [Tr. 171.]

However, the next medical record is dated May 12, 2005, when Dr. Schwartz saw Basso. At this time, Basso told Dr. Schwartz that when she last saw the doctor on April 14, 2005, Basso had been having a good day. By the next day, her pain was so severe, she noticed her chest was swollen. [Tr. 159.] She reported this to Dr. Quay who had an EKG done and told her the results were all right but that she did have some swelling. Basso stated she had not been able to return to work due to the severity of her pain. In fact, she now had trouble driving. Her mother-in-law had been her driver. The physical therapist advised Basso to wear a soft cervical collar, and she was wearing it this day along with her arm splint. Her right arm felt heavy and numb. Her lower back pain was worse at night. She suffered from neck pain and shooting headaches in the back of her head. Basso also had mid-back pain. She used ice to try to relieve the pain. She was also taking Ibuprofen, Hydrocodone, and Lorazepam. Despite the medications, Basso still had severe pain and had trouble sleeping. It was too difficult for her to stand and raise her arm in the clinic. Dr. Schwartz wrote that Basso might have right shoulder issues although the shoulder had appeared to be intact on the previous examination. An MRI of the right shoulder was ordered. Basso was to continue physical therapy. She was prescribed Trazodone for sleep. [Tr. 159, 195.]

On May 24, 2005, Basso again saw Dr. Schwartz. She continued to feel significant heaviness in her right arm and neck. She wore a cervical collar 55% of the time and was wearing the arm sling again on this date. She had been seen by an eye doctor who diagnosed "floaters." She

was told that the vision problems may have been due to the car accident.[15]   At times, Basso saw

"things" in her vision.  She told Dr. Schwartz that her school principal had called her in early May,

asking her about her ability to return to work.  Dr. Quay apparently had placed Basso on restrictions,

including no standing for more than an hour at a time and no lifting anything over 5 pounds.  These

restrictions are not part of the record.  Basso was feeling very sad and fearful.  She recently saw a

car overturned and stated her body started trembling. [Tr. 157.] She was wondering about seeing a

mental health counselor.  Basso told Dr. Schwartz that she would be moving to the New York area

for two months during the summer and requested a referral for physical therapy there.

Dr. Schwartz reviewed the MRI of Basso's shoulder with her.  It revealed moderate AC joint

osteoarthritis contributing to mild impingement.  There was moderate supraspinatus tendinopathy

without a discrete full thickness tear but with a small amount of fluid in the subacromial subdeltoid

bursa suggestive of bursitis.

On exam, Basso was tender over the AC joint.  She had difficulty lifting her arm more than

30 degrees.  Dr. Schwartz believed Basso might benefit from a steroid injection to the shoulder but

since she was moving soon, Dr. Schwartz did not want Basso to have it done at this time.  Dr.

Schwartz recommended that Basso see a psychiatrist in New York followed by physical therapy.

She referred Basso to a psychologist, Gabriella Muñoz, for her "probable PTSD, anxiety/depressive

symptoms" following the car accident.  Dr. Muñoz might be able to advise Basso who to see in New

York.  Basso reported that the Trazodone helped her sleep. [Tr. 157, 193.] It is unclear whether

Basso saw or spoke to Dr. Muñoz or any mental health provider.

---

[15]The vision records are not included in the record.

On August 3, 2005, Basso again saw Dr. Schwartz, after having been in New York for several months. Dr. Schwartz noted that while in New York, Basso had been evaluated by a neurologist, James Morris, and that he had ordered an MRI of her head.[16] That MRI was read as normal and an MRI of her cervical spine showed degenerative disc disease and osteoarthritis at multiple levels with multilevel neural foraminal narrowing with some central stenosis at C5-6. A small disc herniation in the midline was noted at C4-5. There was some bulging disc material mildly encroaching on the left C3-4 neural foramen. Basso was instructed to stop taking Ibuprofen and to begin Relafen.[17] She initially was placed on Skelaxin but on a followup visit on July 26, 2005 with Dr. Morris in New York, it was recommended she stop taking Skelaxin[18] and begin Flexeril.[19] Dr. Morris also instructed Basso to stop taking Hydrocodone and to begin Trazodone.[20] Basso reported that some of her shoulder and back pain had improved but that she still had severe headaches, that she rated as a 5 out of 10, with medications. If she tried to "multitask" or had stress or pain, the headaches increased in severity. She also suffered from associated memory loss. She tended to forget things on the stove and while she was in New York, she went for walks and got lost. She had to knock on doors to get directions. She was sent for physical therapy in New York which she did

[16]None of the New York medical records or testing was made part of this record. It is not clear if Dr. Schwartz had copies of those records since her records refer to some of the New York treatment.

[17]Relafen or Nabumetone is used to reduce pain, swelling, and joint stiffness from arthritis. This medication is known as a nonsteroidal anti-inflammatory drug (NSAID).  www.webmd.com

[18]Skelaxin is a medication used to relax muscles. It is used along with rest and physical therapy to decrease muscle pain and spasms associated with strains, sprains or other muscle injuries.  www.webmd.com

[19]Flexeril is a medication that relaxes muscles. It is used along with rest and physical therapy to decrease muscle pain and spasms associated with strains, sprains or other muscle injuries.  www.webmd.com

[20]Trazodone is an anti-depressant.  It works by helping to restore the balance of a certain natural chemical (serotonin) in the brain.  This drug is used to help people with trouble sleeping (insomnia) to fall asleep. It is also used to help people with anxiety to relax.  www.webmd.com

for awhile.  Basso described the therapy as being helpful for her neck.  Dr. Schwartz did not conduct an examination that day and referred her to physical therapy to continue focusing on her upper neck and posterior head. [Tr. 155, 191.]

On August 10, 2005, Basso was seen again at NovaCare for physical therapy.  She had an initial evaluation for cervical strain and posterior headaches.  She complained of right arm pain, leg pain, headaches and dizziness from the car accident earlier that year. [Tr. 181.] She initially had difficulty moving her right arm, but after therapy, her right arm was all right.  She continued to have headaches and to feel dizzy.  The headaches awoke her at night.  She felt constant pain.  She was wearing a soft cervical collar 50% of the time to help decrease dizziness.  The traction and therapy had helped decrease her headaches.  Basso reported that an MRI showed she had five bulging discs.  She had taken a leave of absence from work as a teacher due to her pain.  She attended physical therapy sessions in New York for two months that were helpful.  But, she suffered from headaches since the car accident.  Her current pain level was 10 of 10.  She suffered from constant headaches and dizziness.  She was only able to partially relieve theses symptoms when lying down.  She was wearing the cervical collar that day.

The therapist noted that her ROM was somewhat limited and that Basso reported dizziness with all movements.  She exhibited increased muscle tightness and pain with palpation. [Tr. 181-82.] Compression increased her headaches, and distraction decreased them.  She was diagnosed with cervical strain and posterior headaches.  The therapist believed Basso needed physical therapy and that her rehabilitation potential was good.  She was to be seen twice a week for four weeks.  It appears from the records that Basso attended two more physical therapy sessions in August 2005.

On August 24, 2005, there is a record from disability services indicating an interview with Basso, but it is unclear whether that interview occurred. [Tr. 57.]

On August 24, 2005, Basso submitted her application for social security benefits. [Tr. 58.]

Near this time, Basso completed a disability report. She described the illnesses that stopped her from working as neck, lower back, 5 "burst" discs, and vision. [Tr. 63.] She stopped working on March 2, 2005 because of the MVA on that date. She had been earning about $31,000 per year as an elementary teacher. She described her position as involving: review of calendars, teaching reading, numbers, letters, pledge of allegiance, colors and prepared materials. She used machines and technical knowledge in her position. [Tr. 64.] Basso walked 5.5 hours of a work day and stood for same amount of hours per day. She sat and stooped for one hour; kneeled and crouched one hour; and, reached and wrote eight hours. [Tr. 64.] She lifted an overhead projector, books, bins, and tubs all day long, containing as much as 25 pounds. She frequently lifted over 10 pounds. On this date, Basso was taking Relafen for pain or as a muscle relaxant and another medication for inflammation. [Tr. 67-69.]

On September 19, 2005, Basso again saw Dr. Schwartz. Basso had undergone physical therapy and felt it was helpful. She currently was not authorized by her insurance company to continue physical therapy, so she was doing an independent therapy program at home. She wore the cervical collar from time to time if she anticipated making quick movements because quick movements caused headache pain posteriorly. [Tr. 153.] Her headache pain was presently an 8 out of 10. Her upper shoulder and back pain was somewhat better. With medications, the pain was reduced to a 5 of 10. Without medications, however, the pain was an 8 of 10. She was taking Relafen and Flexeril. She believed the medications helped her sleep. She had been seen for chest pain but said the EKG was all right. Her labs showed her cholesterol was high, and she was placed on a diet.

Basso reported she had trouble reading because she immediately got headaches.  She also had trouble with her memory.  On exam, Basso exhibited a fairly full cervical ROM.  When she looked up, however, she described neck and posterior head pain.  She was only able to perform extension to 10 degrees.  She was able to bend forward and to touch her toes.  Her muscle stretch reflexes were 2+ at the bilateral biceps and triceps, etc.  Dr. Schwartz wrote that her complaints from the MVA were ongoing, but that Basso had improving complaints of her neck and back pain and posterior headaches.  Basso continued her independent physical therapy program at home and was to wear her soft cervical collar.  She was taking Relafen and Flexeril as needed for muscle spasms.  Dr. Schwartz had no further recommendations for care but stated Basso should return in three weeks. [Tr. 153, 189.]

On November 2, 2005, Basso saw an endocrinologist regarding reevaluation of her thyroid hormone replacement medication.  She was last seen in October 2002.  Basso had had radioactive iodine treatment for her thyroid problem in the early 1990's, which was presumably for thyrotoxicosis.  She had severe GERD in the past.  It appeared difficult to find the best thyroid medication for Basso.  Dr. Gleeson noted that Basso was originally from El Salvador.  She frequently had headaches from a recent MVA, along with some disc injury. [Tr. 136, 137.]

On November 9, 2005, Dr. Quay saw Basso.  This is the first medical record from Dr. Quay even though other records make it clear he had been treating Basso after the March 2005 accident. [Tr. 134.] Dr. Quay noted that Basso was dealing with ongoing pain in the posterior neck and headaches.  She was taking Cyclobenzaprine,[21] Nabumetone, Hydrocodone prn, and Synthroid.  Her headaches continued to be "somewhat disabling" to the point where she could not fix meals or

---

[21]Generic for Flexeril.  www.webmd.com

perform basic household chores.  She was feeling worthless and tearful.  Her sleep was interrupted due to the need to frequently urinate.  She was diagnosed with headaches and situational depression. Dr. Quay wished to discontinue the Nabumetone to see if that helped the urination problem.  She was to start on Diclofenac.[22]  She was also given an anti-depressant, Lexapro, and counseled on the appropriate use of antidepressants including the need to take them on a daily basis.  [Tr. 134.]

On November 15, 2005, there is a disability services Function Report filled out by Basso. She lived in a house with her family.  She placed a pillow under her head and carefully adjusted herself when she got up.  She usually had sleepless nights and awoke with severe headaches.  In the mornings, Basso made herself hot cereal and took her medications.  She took her son to school and then rested all day until she picked him up.  After eating, she took her medications and went to bed with an ice pack for her head. [Tr. 75.] Her husband took care of their five-year old son and did the cooking, cleaning and laundry.  She used to prepare meals and do the housework and play with her son.  She previously was able to concentrate for more than 45 minutes but at this time she suffered from "shooting/stabbing" pains and headaches that caused her to awake 5 to 10 times per night [Tr. 76.]    With respect to personal care, Basso dressed and bathed very slowly and carefully.  She could not move quickly or she became dizzy.  She ate more fast food.  She did not stand for more than one hour and was unable to do house or yard work. [Tr. 77.] Her husband did most of the chores and shopping.  Basso went outside 30 minutes once a day, but her headaches interfered with activities.  She tended to feel dizzy after standing up for an hour.  She drove 1% of the time with respect to doctors' appointments.  She had "crashed" her car backing out of the driveway because of her anxiety.

---

[22]This medication is known as a nonsteroidal anti-inflammatory drug (NSAID).  www.webmd.com

15

Basso read and watched television but she could only read a few minutes before getting dizzy. She was not able to do hobbies because of severe headaches. [Tr. 79.] She spent time with a Christian friend who read from the bible once a month. [Tr. 79.] Basso could not go for a walk or to the park with her son. [Tr. 80.] She was unable to lift more than five pounds. Walking for more than ten minutes cause lower back pain. [Tr. 80.] Basso had trouble with lifting, squatting, bending, and most every activity. She was able to sit or climb the stairs. [Tr. 80.] She could only pay attention for 15 minutes. Basso handled stress all right, but was afraid of driving and dying. [Tr. 81.] She used a brace/splint and eyeglasses since the accident. She had to be prescribed eyeglasses in April after the accident. She was wearing the cervical collar 60% of the day. Her husband reported a change in her level of moodiness and irritability and ability to remember things. [Tr. 82.]

### 2006 Medical Records

On January 2, 2006, Basso saw Dr. Schwartz for the first time in about 3 months. She had discontinued physical therapy as no more sessions were authorized. Basso continued to wear the cervical collar stating that it helped her with quick movements because she felt head pain and dizziness if she moved too quickly. She had increased lower back pain of a severe nature, and the pain shot down her legs. She was having trouble with urinary frequency but her urinalysis had been normal. The Diclofenac seemed to be helping her pain. Dr. Schwartz reported limited ROM of the lumbosacral spine and increased pain with extension and forward flexion. She was tender diffusely in the lower back. Dr. Schwartz's record again states "ongoing but improving complaints of neck pain with worsening low back pain." She was referred to physical therapy for lumbosacral pain and given Lidoderm patches. The doctor observed that she might consider an MRI of lumbosacral to rule out worsening of the previous cyst in the area or other neuropathic problems. [Tr. 152.]

16

On January 20, 2006, Dr. Bocian, a disability services' physician, conducted a physical RFC assessment for status post cervical strain. [Tr. 119.] He found Basso could lift 20 pounds occasionally and 10 pounds frequently. She was able to stand, walk or sit for six hours out of an eight-hour workday. Her abilities to push or pull were unlimited. The physician noted that the MRI results of the head were negative and that a September 19, 2005 examination showed a fairly full cervical ROM and that she could bend and touch her toes. That exam also demonstrated that Basso could rise on her heels and toes and that her muscle stretch reflexes were 2+ at the bilateral biceps and triceps. Dr. Bocian assigned frequent limitations on Basso's abilities to climb, stoop, kneel, crouch, crawl. She could occasionally climb a ladder and balance. [Tr. 119-21.]

On January 23, 2006, Disability Services denied Basso's initial application for benefits "status post cervical strain." [Tr. 29.] An explanation of the denial stated that it appeared, based on medical reports, that Basso could do light exertional level work which is what she did as a school teacher in accordance with the DOT description of that job. [Tr. 71, 73, 74.]

On February 3, 2006, Basso was seen for a gynecological exam. She told the medical care provider that she had had a car accident and that she was doing a lot better. She had not returned to teaching, however, because of chronic pain. She felt mild tightness around the cervical spine. Her neck felt a bit tight in the trapezial region. She exhibited a full ROM of her shoulders, elbows, wrists, hands and joints. She had equal grip strength. [Tr. 132.]

On February 16, 2006, Dr. Schwartz saw Basso who had been unable to follow through with physical therapy because her medical benefits were exhausted. However, Basso had been going to the pool at the Chavez Center and did an independent "land" exercise program. Basso felt she was doing better overall but complained of posterior headaches that she rated as a 2 to 3 of 10. She also suffered from urinary frequency that kept her up at night. Her vision was problematic and she had

17

been given reading glasses a year ago.  She continued to take Diclofenac.  On exam, she had a fairly full ROM, but when Basso looked up, she described neck and posterior head pain.  Her extension ability remained at only 10 degrees.  She could touch her toes and perform a heel/toe walk.  Dr. Schwartz referred Basso to Dr. Quay for routine care and to return to Dr. Schwartz as needed. [Tr. 151.]

On February 22, 2006, Basso was seen by Dr. Quay regarding ongoing bladder problems.  She also felt mild associated nausea.  Overall, she said she was going better with her neck and back discomfort, but she complained of eye problems.  Labs were ordered. [Tr. 131.]

On March 7, 2006, Basso followed up with Dr. Quay regarding her lab work.  She had recently experienced significant worsening of her upper back, neck and head pain which followed an increase in her walking routine.  She rated her pain as a 10 of 10 for the last week and a half.  She also had recent heart palpitations.  She continued to have frequent urination problems.  She was not taking an antidepressant, but was taking Diclofenac and Synthroid.  There was tenderness to palpitation of the musculature of her upper back, and the trapezius was tender.  Basso's blood work was normal.  She said her pain in the back, neck and head had been gradually improving until recently.  Dr. Quay added Norflex.  He urged her to continue walking but at a reduced rate if needed. [Tr. 129.]

On March 9, 2006, Dr. Schwartz again saw Basso.  While Basso said she had been doing better at the last appointment on February 16, she was not feeling as well now.  She had gone to see the principal at the school district office but she had the impression that he would not be able to re-hire her. [Tr. 150.] She had attempted then to be "normal" and to increase her walking time around the house, but when she did that, the pain worsened.  She was waking up with headaches that she rated as 10 of 10. Her arm felt "weird."  She sometimes felt she could not breathe.  She felt paranoid

that she was not going to get better.  Dr. Schwartz noted "exquisite tenderness" to palpation over the occipital ridge of the cervical spine.  Her muscle stretch reflexes remained symmetric.  She was able to toe/heel walk.  Dr. Schwartz referred Basso to physical therapy for six visits.  She was to begin Flexeril for muscle spasms.  This was a setback but Dr. Schwartz did not feel she needed to obtain recurrent studies.  She wanted to see if conservative treatment would help Basso. [Tr. 150.]

On April 10, 2006, Dr. Schwartz saw Basso, who complained her arm was going "flat."  She had no strength in her arm and it felt heavy with pain in the muscles.  Basso did not feel it was safe for her to drive.  Pain medications helped reduce the pain from a 10 to a 7.  She felt "little balls of hardness" in her legs.  She was very tearful and stated she could not live in this degree of pain.  The pain in her neck radiated into her head.  She described the pain as deep and not an average pain.  It was debilitating and overwhelming. Basso continued to wear the soft cervical collar frequently.  She was tender over the occipital ridge of her cervical spine and the posterior head.  She was able to toe/heel walk but had difficulty abducting her right arm.  Dr. Schwartz's impression was "worsening of the posterior headaches associated with neck problems."  Dr. Schwartz noted that Basso had had three MRI's of her neck (3/2/05, 4/9/05 and 7/8/05), none of which are in the record.  The July MRI showed degenerative disc disease and osteoarthritis with multilevel foraminal narrowing and developing central canal stenosis at C5-6.  Small disc herniation was shown at the midline at C4-5.  There was bulging disc material which mildly encroached on the left C3-4 neural foramen.  The MRI of the right shoulder in May showed moderate AC joint osteoarthritis and mild impingement.  Basso might have bursitis.  Dr. Schwartz wished to add Lyrica to address the nerve pain.  She also suggested that Basso consider a right shoulder injection at the pain clinic or an occipital nerve block. [Tr. 111.]

19

On April 24, 2006, Basso was seen by Physician Assistant Walter in Dr. Schwartz's office. Basso reported having some relief with Lyrica and that she did not have side effects. Her pain was a constant 10 of 10, 24 hours a day. It was made tolerable only by lying flat and icing her back and neck. She continued to have constant neck pain and headaches with a sense of heaviness and diminished sensation in the muscles of the right upper extremity. It had become slightly more tolerable but Basso needed help with daily activities. She could do light meal preparation and drive her son to school occasionally. She continued to use the soft cervical collar as needed. She performed home exercises as taught to her by outpatient physical therapy. She felt that since using Lyrica she could think and concentrate more. Basso stated she had been given a referral by her PCP to the pain clinic for an evaluation of a cervical injection. She was taking Fluoxetine, Flexeril and Lyrica. She was having some studies done for nocturia. She held her neck in a very guarded way. The ROM of her neck was diminished. She demonstrated diminished sensation to light touch over the entire right arm. There was a significantly decreased ROM of her right shoulder. The grip strength was -4 on the right, compared to 4+ on the left. [Tr. 109.]

On April 25, 2006, Basso's request for reconsideration of the initial denial of her benefits application was denied. The explanation of the denial noted that it was reasonable to conclude Basso had the RFC for light work with postural limitations. Basso, however, described her prior work as heavier than the light description provided by the DOT. [Tr. 26, 28.]

On May 1, 2006, Basso submitted a request for an ALJ hearing stating that she was totally disabled from performing significant gainful activity. [Tr. 34.]

On May 1, 2006, Dr. Quay wrote a letter "to whom it may concern" on behalf of Basso. He stated that he had been seeing Basso since March 2, 2005, the date of her MVA. She has multiple complaints of pain in her neck, back and extremities, and headaches. Her most prominent

complaints are continued posterior neck discomfort with associated headaches. Basso also suffered from depression related to constant pain. Dr. Quay wrote that he believed for the time being Basso was "temporarily [and] completely disabled" from any kind of gainful employment as a result of this collection of problems. Treatment was still ongoing, and he anticipated eventual recovery. [Tr. 115.]

On May 11, 2006, Basso was seen by Dr. Quay for ongoing neck and shoulder pain and persistent headaches. She reported that Lyrica[23] was causing insomnia and that Flexeril caused an upset stomach. She felt progressive weakness in her arms over the last weeks and palpitations during the night. She underwent an evaluation by the Nephrology Department regarding the urinary frequency problem. Dr. Quay reviewed previous summaries of MRI results. He did not think that Lyrica was causing insomnia. He suggested Basso increase the anti-depressant medication. [Tr. 90.]

On May 30, 2006, Dr. Quay again saw Basso for "longstanding" neck, shoulder, upper back discomfort and headaches, all occurring after a March 2005 MVA. She was taking an anti-depressant, Methocarbamol,[24] and Diclofenac. She was doing somewhat better with Methocarbamol but still complained of neck pain, headaches, numbness and heaviness in the arms when she awoke in the morning. As the day progressed, her problems improved. Dr. Quay wanted Basso to increase her anti-depressant but noted she had not done so yet. He again asked her to increase the anti-depressant medication. It is not clear if she did. [Tr. 89.]

On June 22, 2006, Dr. Schwartz saw Basso who reported that increased Lyrica caused her to be somewhat restless but that her headaches had improved. The pain level was now an 8 of 10

---

[23]This medication is used to treat pain caused by nerve damage due to diabetes and shingles (herpes zoster) infection. It is also used to treat pain in people with fibromyalgia.   www.webmd.com

[24]This medication relaxes muscles. It is used along with rest and physical therapy to decrease muscle pain and spasms associated with strains, sprains or other muscle injuries.   www.webmd.com

instead of 10 of 10. She awoke with stiff arms. She could not feel her fingers when she first awoke. She held her head and took some deep breathes. Then she took a warm bath and did therapy in the warm bath. It took her awhile to move around. She then ate, took her medications and went for a walk. If she overdid it, she was worse the next day. She no longer wore the cervical collar. Basso did not want to do outings with the family because it was too taxing. She was taking Diclofenac, Flexeril and an anti-depressant. She was tearful during the examination. Dr. Schwartz noted diminished ROM of the cervical spine. The worsened posterior headaches were likely associated with neck problems, degenerative disc disease and osteoarthritis with central spinal stenosis of C5-6 with a small disc herniation at C4-5. Dr. Schwartz again summarized the same MRI results previously noted. Basso was not interested in undergoing any cervical or shoulder injections. The Lyrica dosage was reduced. [Tr. 108.]

On July 24, 2006, Dr. Schwartz wrote a letter on behalf of Basso addressed to "whom it may concern." [Tr. 114.] Dr. Schwartz had been seeing Basso since April 14, 2005. Basso suffered from a history of chronic headaches and neck pain with degenerative disc disease, spinal stenosis, and a disc herniation, per testing. Basso suffered increased head and neck pain after the MVA. Dr. Schwartz noted that Basso recently had been denied social security benefits and she asked that the decision be reviewed. Dr. Schwartz's recommendation was that Basso be found permanently disabled as she would have difficultly sustaining a productive work life secondary to chronic and severe pain related to the above diagnoses. [Tr. 114.]

On August 31, 2006, Dr. Schwartz saw Basso, who complained of increased pain in her neck. She was wearing her cervical collar again and said if she did not wear it, she felt dizzy. She did everything very slowly. If she had enough energy, she took a bath which helped her do some exercises. She stated to Dr. Schwartz that she knew she could not work due to her overall painful

condition.  She also complained of recurrent chest pain with shortness of breath at night.  She had

been seen by Dr. Quay who did an EKG and told her everything was all right and that the problems

were probably muscular in nature.  She had stopped taking Lyrica about 3 days ago because she ran

out of the medication.  She also stopped taking the anti-depressant but she continued on Diclofenac.

Basso intended to go for acupuncture treatment on September 11, 2006.  She was observed to have

a sad, flat affect.  Her ROM of the cervical spine was diminished.  She bent forward such that her

fingertips were about 8 inches from the ground.  She was tender to all 18 sites consistent with

fibromyalgia.  Basso was to begin Cymbalta in lieu of her previous anti-depressant, to address both

fibromyalgia and depression.  She was to resume Lyrica to address neuropathic pain. [Tr. 107.]

On September 7, 2006, Basso saw Dr. Quay.  She complained of chest pain intermittently

for the last two weeks.  She felt a heaviness in her chest that came and went that was typically

relieved by resting.  She noted a recent episode of her heart racing, which she experienced in the

evening with shortness of breath lasting 30 minutes.  She was taking Cymbalta, Lyrica and

Diclofenac.  An exam was not performed.  The EKG was again noted as entirely normal.  It was

difficult for Dr. Quay to say what caused her heart to race as it was normal that day.  After the

MVA, Basso suffered from persistent disabling discomforts and accompanying depression. [Tr. 87.]

Fibromyalgia was suspected.

On October 16, 2006, Basso again saw Dr. Quay for a follow up to lab work that was done.

The medical record indicates that since the March 2005 MVA, Basso suffered from significant neck

pain and occipital headaches as well as a number of other bodily discomforts for which she was

being followed by Dr. Schwartz of Physiatry.[25] Basso was in considerable distress on this date.  She

was frequently tearful and brought a three-page written note describing her discomforts, fatigue, and

general malaise which pain medications apparently were not sufficient to relieve. [Tr. 85.] Basso

was seeing a Christian counselor who she felt was very helpful in dealing with her despair.  She

denied suicidal ideation and declined to see a psychiatrist.  Basso found acupuncture too painful.

She had been seen at the pain clinic but refused injections because a friend of hers received a steroid

injection and became paralyzed.  Basso refused to return to the pain clinic.  Dr. Quay's assessment

was: multiple bodily discomforts and severe depression following the MVA from which she "never

rebounded."  She had tried a number of modalities and refused to try others.  She declined further

intervention by Dr. Quay at this time.  She was to continue on her current medication regimen.  Dr.

Quay encouraged her to engage in regular physical activity.  She reported to Dr. Quay that Dr.

Schwartz believed the fibromyalgia was triggered by the collision. [Tr. 85.]

### 2007 Medical Records

On January 30, 2007, Basso was seen by Dr. Stephen Dunlap when Dr. Quay apparently was

unavailable.  The problem list included cervical strain with muscle spasms and myofascial pain

syndrome and severe costochondritis.[26]   She was taking Cymbalta, Lyrica, Diclofenac and

Synthroid.  Ever since the MVA in early 2005, Basso had recurrent and fluctuating chronic pain

marked mainly by recurrent episodes of posterior cervical muscle spasms, pain, pressure tension

---

[25]Physiatry is the branch of medicine that deals with the prevention, diagnosis and treatment of disease or injury and the rehabilitation from resultant impairments and disabilities, using physical agents such as heat and cold and therapy.  Dorland's Illustrated Medical Dictionary, p. 1464 (31st ed. 2007).

[26]Costochondritis is an inflammation of the cartilage that connects a rib to the breastbone (sternum). It causes sharp pain in the costosternal joint — where your ribs and breastbone are joined by rubbery cartilage. Pain caused by costochondritis may mimic that of a heart attack or other heart conditions. http://www.mayoclinic.com/health/costochondritis/DS00626

headaches in the greater occipital nerves and recurrent upper back inerscapular and anterior chest and shoulder pain.  Basso complained of more anterior chest wall pain over the last couple of weeks and rapid heartbeat.  She was wearing a soft cervical collar and this made her hold herself in a fairly stiff posture.   When it was removed, she had tenderness to palpation in the bilateral sternocleidomastoid muscles and tight spasms in the bilateral upper trapezius muscles, tight focal spasm in the rhomboid minor and rhomboid major muscles bilaterally, exquisite mild myofascial trigger points in the middle and posterior scalenes.  She should try to minimize lifting and carrying.  Dr. Dunlap recommended gentle neck and shoulder rolls, hot baths, regular gentle exercise. [Tr. 98.]

On February 12, 2007, Basso saw Dr. Schwartz.  Basso complained of neck pain, total body pain and some episodes of chest pain.  Again, it was discussed that the EKG had been normal.  Basso reported that when her pain was really bad she took additional Ibuprofen.  Dr. Schwartz recommended she not take Ibuprofen with Diclofenac, and suggested she take Tylenol as needed instead.  Basso continued to wear the soft cervical collar intermittently.  She had had an episode of trying to walk 15 minutes twice a day and then could not get out of bed the next day due to generalized pain.  She exhibited a flat, sad affect.  She was tender everywhere she was touched, especially over the chest.  Dr. Schwartz's impression was recent recurrence and exacerbation of the neck and back pain, fibromyalgia, and presumed depression. [Tr. 97.]

On March 20, 2007, PA Walter again saw Basso who reported increased fatigue.  She continued to have severe headaches with a sense of fogginess.  She awoke with stiffness in her body and deep muscle aching that felt like the flu.  Basso felt dizzy when she first tried to get up.  Any small activity in the house made her tired.  She needed help from people at the church to clean her house and do laundry.  She felt her husband had been the primary care provider of their 7 year old son.  Basso did not have the energy and was in too much pain to deal with her son.  She was not able

to work since the MVA.  She continued taking Diclofenac, Cymbalta and Lyrica.  She was using Tylenol as needed for pain.  She also used heat and ice.  She felt that even if she got a good night's sleep, she was very, very fatigued the next day.  The fatigue came on suddenly.

On exam, she could ambulate without an assistive device.  She was wearing her cervical collar.  She was pleasant appearing but depressed appearing.  She was very sensitive to touch and tended to "jump away" from touch consistent with fibromyalgia.  The ROM of the cervical spine was impaired.  PA Walter wrote: "regarding disability . . . . [Basso] made no progress in terms of functional abilities and in fact has declined overall to the point where she needs help."   Basso suffered from constant aching, diffuse body pain and frequent, severe headaches.  There was decreased ROM at the neck and lumbar spine.  She subjectively complained of dizziness and of cognitive issues in terms of general fogginess, and difficulties with memory. [Tr. 103.] Basso could not sustain any significant activity in PA Walter's view.  "From my standpoint this patient is totally and permanently disabled from the standpoint of her ability to engage in any type of gainful employment given her inability to even adequately function on a day to day basis."  This note was sent to Dr. Quay and the State of New Mexico Retirement Board. [Tr. 102.]

On March 22, 2007, Dr. Quay wrote a second letter on behalf of Basso addressed again to whom it may concern.  Dr. Quay stated that he had followed Basso since her MVA.  Since that time, Basso had been suffering from chronic pain and was diagnosed with fibromyalgia and probable depression.  "It is my opinion she is completely and permanently disabled from these conditions." [Tr. 104, 105.]

On May 11, 2007, the New Mexico Educational Board noted the Medical Review Board had met on May 9, 2007 and had recommended disability status for Basso. [Tr. 205.]

On September 18, 2007, the ALJ held a hearing on Basso's application.  Basso's attorney advised the ALJ that Basso received disability retirement from the school district.  She also stated that earlier on August 18, 2006, Basso's attorney had asked for an "on the record decision," without the need for an ALJ hearing. [Tr. 209.] Basso's attorney again was requesting an "on the record decision," particularly after the award of disability benefits by the State.  Basso's attorney argued that Basso's very strong earnings record from 1985 through 2005 until the MVA, and medical care providers' letters supported an "on the record" finding of disability. [Tr. 210.] While the ALJ did not expressly reject this argument, he proceeded with the hearing.

Basso testified that her cervical spinal problems, fibromyalgia, chronic fatigue and severe headaches lasting 24 hours a day prevented her from working.  She still did physical therapy and took medications, but she had to do all of her activities very slowly and carefully, and she needed to rest. [Tr. 211-13.] The severity of her headaches was a 10 of 10 and it was constant.  With medications, the severity was reduced to 9. [Tr. 213.] She suffered from muscle pain everywhere, including in her joints and muscle ligaments.  The pain moved up her arms and into her fingers. Even writing was painful.  She could not play with her son. [Tr. 213.] Her cervical problem affected her breathing and she tended to get shortness of breath. [Tr. 214.] She was unable to stand more than one hour or lift more than 5 pounds as stated by her doctor. [Tr. 214.] If she lifted more than that, she felt like her brain was "about to open."  If she stood more than one hour, she began to sweat. [Tr. 214.] If she sat, she had to switch positions every 20 minutes or she suffered shooting pain from the lower back to her legs. [Tr. 215.] She felt pressure in her back and legs and sometimes felt like she had needles in her feet. [Tr. 215.] She felt best when she was lying on the floor with an ice pack which she did every day, for almost the entire day. [Tr. 216.] She still became dizzy and had to get

up 5 to 7 times a night with headaches.  All day long, Basso tried to avoid falling because of dizziness.  She had a poor memory and was unable to make decisions as she did before.

The ALJ questioned Basso briefly and asked if the pain was the same or worse from a year ago.  Basso stated it was the same and it was getting worse, that her muscles were weaker. [Tr. 218.] She further stated that she could not wait for that day when she would be strong and able to go back to her duties.  She had the same or worse pains and hoped they would go away. [Tr. 218.]

The ALJ presented a hypothetical to the VE and the VE testified there was no reason based on the hypothetical that Basso could not return to her prior relevant work.  If her concentration were markedly impaired, that would impair her ability to perform her past work. [Tr. 220.] At the end of the hearing, Basso's attorney asked that she be found credible based on her testimony, strong earnings record and the doctors' letters on her behalf. [Tr. 220.]

On September 27, 2007, the ALJ issued an unfavorable decision finding that Basso could return to her past relevant work with some limitations.  He did not find her credible as to the degree of her limitations.  The ALJ discounted or disregarded the health care providers' letters. [Tr. 11-17.]

On October 15, 2007, Dr. Quay wrote a third letter on behalf of Basso. [Tr. 206.] He wrote that Basso had significant pain since her MVA.  She suffered from occipital headaches, pain radiating from her neck into the right upper extremity, degenerative disc disease in her neck, osteoarthritis, central spinal stenosis at C5-6 with a disc herniation at C4-5, right AC joint osteoarthritis, supraspinatus tendinopathy, fibromyalgia and depression.  Basso had undergone physical therapy, had taken medications and was seen regularly by Dr. Schwartz.  Despite all of her treatment, she continued to be unable to hold a job.  Dr. Quay opined that Basso was completely disabled due to severe pain and fatigue.  While he had hoped these conditions would be temporary, he now believed her disability was permanent. [Tr. 206.]

28

On November 19, 2007, Basso's attorney wrote a letter on her behalf to the Appeals Council. In its decision, the Appeals Council considered Dr. Quay's third letter, written October 15, 2007, but declined the request for review. [Tr. 2-6.]

## Discussion

## I.   STEP FOUR - RFC FINDING

Basso argues that the ALJ erred at the step four analysis and failed to make findings of fact that were supported by substantial evidence. The Court summarizes part of Basso's argument as follows: in reaching his RFC findings in phase one of step four, the ALJ erred in discounting medical opinions concerning Basso's physical or mental limitations and erred in wrongly discounting the credibility of Basso's subjective testimony.  Thus, Basso's position is that the ALJ's RFC finding is not supported by substantial evidence.

Step four of the evaluation process requires the ALJ to (1) evaluate the claimant's physical and mental capacity (RFC); (2) determine the physical and mental demands of the claimant's past relevant work; and (3) decide whether the claimant has the ability to meet these job demands despite the mental or physical limitations found in phase one.  Bowman v. Astrue, 511 F.3d 1270, 1272 (10th Cir. 2008) (citations and internal quotation marks omitted); Winfrey v. Chater, 92 F.3d 1017, 1023 (10th Cir.1996).  At each of these three phases, the ALJ must make specific findings.  Id.

"The burden is on the claimant to show that her impairment renders her unable to perform her past relevant work."  Henrie v. United States Dep't of Health & Human Services, 13 F.3d 359, 360 (10th Cir. 1993).  However, the ALJ has a duty "of inquiry and factual development" as part of his obligation to fully and fairly develop the record.  Id., 13 F.3d at 361.

As part of the RFC determination (phase one), the ALJ must consider the credibility of Basso's subjective testimony about her pain and its effect on her ability to work.  S.S.R. 96-7p, 1996

WL 374186, at *2 (July 2, 1996).  Credibility findings are "peculiarly the province of the finder of fact, and . . . [will not be] upset . . . when supported by substantial evidence."  Kepler v Chater, 68 F.3d 387, 391 (10th Cir. 1995) (internal citations and quotations omitted).  The reviewing court does not substitute its own judgment for that of the fact finder.  However, "findings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings."  Id. (internal citations and quotations omitted).

The ALJ found that Basso retained the RFC for light work requiring only occasional postural limitations or movements and that Basso also had moderate limitations in concentration, persistence, or pace, defined as needing a 30-60 second break every 10-15 minutes. [Tr. 15.] In so finding, the ALJ stated he carefully considered the entire record and considered all symptoms and the extent to which they could reasonably be accepted as consistent with the objective medical evidence and other evidence. [Tr. 15.] In addition, the ALJ examined Basso's credibility as to whether her impairments could reasonably be expected to produce or pain or symptoms, based on the intensity, persistence and limiting effects of the claimant's symptoms.

The ALJ determined that Basso's testimony that she suffered from headaches approximately 14 hours of every day and that her pain level was a 10 of 10, and other testimony, was "exaggerated and inconsistent with her conservative medical treatment . . . ." [Tr. 15.] The ALJ compared Basso's complaints to four comments in four of Dr. Schwartz's medical records:  in April 2005, Dr. Schwartz released Basso to work; in April 2005, Basso reported a pain level of 2 out of 4 with medication; in September 2005, Basso felt that therapy had been very helpful; and in October 2006, Dr. Schwartz stated that Basso had tried a number of modalities and refused to try others and declined any further intervention. [Tr. 15-16.]

30

The ALJ then addressed Dr. Quay's, Dr. Schwartz's and PA Walter's letters. Opinions of Dr. Quay and Dr. Schwartz were afforded minimal weight as the doctors opined on the ultimate issue of disability, an issue reserved for the Commissioner. The ALJ also very briefly attempted to demonstrate that the treating physicians' records contained evidence that conflicted with their ultimate opinions of disability. [Tr. 16.] The ALJ correctly assigned no weight to the PA's opinion because the ultimate issue of disability is reserved to the Commissioner and because a physician's assistant is not an acceptable medical source. [Tr. 16.]

Having reviewed the findings and compared them to the record as a whole, the Court is not convinced that substantial evidence supports the ALJ's RFC findings at phase one of step four. The objective medical evidence, with few exceptions, demonstrates a prolonged history of chronic pain and headaches. The ALJ concluded that the allegations of debilitating pain were exaggerated and inconsistent with Basso' medical treatment. Indeed, it may well be true that Basso "over egged the custard" and exaggerated the severity of her pain. However, in rejecting Basso's complaints, the ALJ must consider all of the evidence. *See* Hardman v. Barnhart, 362 F.3d 676, 681 (10th Cir.2004) ("[i]t is improper for the ALJ to pick and choose among medical reports, using portions of evidence favorable to his position while ignoring other evidence.").

For example, the ALJ referred to information from an April 14, 2005 medical record stating that Dr. Schwartz released Basso to work as of April 25, 2005. [Tr. 15, 163.] However, it was Basso who requested that Dr. Schwartz release her to return to work at this appointment. [Tr. 162.] On May 12, 2005, Basso explained to Dr. Schwartz that she had had a good day on April 14, 2005, when she had requested a release to return to work, but that the day after May 12, her symptoms became so severe that she had been unable to return to work. She had severe neck pain and shooting occipital headaches and was taking a narcotic pain medication. Despite strong pain medication,

31

Basso could not sleep and was given another medication to try to help her with pain and insomnia. [Tr. 159.]

The ALJ referenced additional notations from this same April 14, 2005 medical record indicating that Basso's pain her lower back was in the range of 2-4 with medications. [Tr. 161.] It is true that on this occasion, Basso stated she believed her neck pain was nearly resolved from the MVA. She exhibited fairly good cervical and lumbar ROM and wanted to return to work. However, a month later, as noted, she did not feel well at all and her symptoms had worsened significantly. [Tr. 159.]

The ALJ referred to only a small portion of a medical record from September 2005, where Basso reported physical therapy had been "very helpful." [Tr. 153.] This same medical record evidences other indicia of significant pain. It shows, for example, that Basso was wearing her soft cervical collar and that quick movements caused headache pain posteriorly. Her headache pain was an 8 of 10. She was taking two muscle relaxants. She had trouble reading because she suffered from headaches. While she had fairly full cervical ROM, when she looked upward, she had neck and posterior head pain. Her extension was only 10 degrees. [Tr. 153.]

The medical records demonstrate that Basso had some good or better days, but the medical records also consistently reflect that Basso's symptoms did not resolve. Instead, her headaches and chronic pain worsened over time. Treating physician Dr. Quay once wrote that Basso was temporarily and completely disabled but that he expected her to recover. However, he later wrote a letter explaining that while he had hoped Basso's disabling condition would be temporary, he changed his opinion and believed her severe pain and fatigue were permanent. [Tr. 206.]

The medical records reflect a trend of improvement and then worsening of symptoms. The "good-day" "bad-day" evidence must all be considered, and it appears that only the "good-day"

evidence formed the basis of the decision.  It is impermissible to pick and choose from records when Basso may have been having a good day and not to consider other medical records that indicate Basso's symptoms deteriorated.  For example, 2007 medical records document that Basso had suffered recurrent and fluctuating chronic pain since the MVA, marked mainly by recurred episodes of posterior cervical muscle spasms, pain, pressure tension headaches and recurrent upper back interscapular and anterior chest and shoulder pain.  She had undergone severe courses of physical therapy with recovery. [Tr. 98.] She was wearing a soft cervical collar in 2007.

Basso continued to have neck pain, total body pain and some episodes of chest pain.  When she tried to walk for 15 minutes two times a day, she could not get out of bed the next day.  She was tender everywhere the doctor touched. [Tr. 97.] In March 2007, Basso continued to have severe headaches with fogginess, stiffness and dizziness.  The ROM of her cervical spine was impaired. She felt "very, very fatigued" even when she slept better. [Tr. 102.]

In early 2006, Basso was wearing her cervical collar and still feeling head pain and dizziness. She had increased lower back pain with pain shooting down her lets.  The ROM of her lumbosacral spine was limited.  There was increased pain with extension and forward flexion. [Tr. 152.] In February 2006, Basso appeared to have a good day.  She was "overall doing better with her neck and back discomfort." [Tr. 131.] However, less than a month later, the medical record indicates Basso again experienced a significant worsening of her upper back, neck and head pain after she had tried to do more exercise. [Tr. 129.] Her pain was a 10 of 10.  She explained that her pain had been gradually improving until another recent onset. [Tr. 129.]

The records are consistent in this regard.  Basso also told Dr. Schwartz she had been improving in February 2006 and had spoken to her principal to see if he might rehire her.  However,

after sensing that her principal would not rehire her, Basso attempted to exercise more with the result that her pain worsened.  She awoke with headache pain rated as a 10 of 10. [Tr. 150.]

In April 2006, Basso's pain was still significant, and she was very upset.  She stated she did not think she could live in that amount of pain.  The pain in her neck was radiating into her head. She described the pain as deep, debilitating and overwhelming. [Tr. 111.] She was frequently using the cervical collar.  The doctor's impression was that there was a worsening of Basso's posterior headaches associated with neck problems. [Tr. 111.]

Basso's problems were confirmed, at least to some extent, by medical testing.  MRI's showed degenerative disc disease and osteoarthritis with multilevel foraminal narrowing and developing central canal stenosis at C5-6.  She had a small disc herniation and multiple bulging discs. [Tr. 111.] In April 2006, Basso reported that her pain was a constant, 10 of 10, 24 hours a day. She said it was tolerable only when she was lying flat and icing her back and neck. [Tr. 109.]

In May 2006, Basso felt progressive weakness in her arms over the last few weeks and still suffered from persistent headaches. [Tr. 90.] Later in May, Basso was still complaining of neck pain, headaches, numbness and heaviness in her arms. [Tr. 89.] In June 2006, Basso's headaches seemed improved but there was diminished ROM of her cervical spine.  If she overdid any of her exercises, she was worse the next day. She still wore her cervical collar.  The doctor believed that her worsening posterior headaches were likely associated with neck problems, degenerative disc disease and osteoarthritis. [Tr. 108.]

In August 2006, Basso had increased pain in her neck and was dizzy if she did not wear the cervical collar.  She was in such pain then, she did not believe she could work.  She exhibited a diminished ROM of the cervical spine and was tender to all 18 sites consistent with fibromyalgia. [Tr. 107.] In October 2006, Basso visited the doctor with a three-page list describing her

34

discomforts, fatigue and general malaise.  The pain medications were not relieving her symptoms. The doctor noted she had had multiple body discomforts and severe depression following the MVA from which she had never rebounded. [Tr. 85.]

The ALJ's brief references to three records indicating Basso might have had a few good days is contradicted by significant evidence to the contrary.  The ALJ must evaluate "all relevant evidence to obtain a longitudinal picture of [the claimant's] overall degree of functional limitation." 20 C.F.R. § § 404.1520a(c)(1), 416.920a(c)(1) (emphasis added).  Here, the ALJ selected the medical evidence that supports his decision; there is little discussion of any other evidence.

The Court is also concerned with the minimal weight afforded Basso's treating physicians, particularly in view of the entire record.

> Generally, the "treating physician rule" requires the ALJ to give greater weight to the opinions of doctors who have treated the claimant than those who have not. <u>Hackett v. Barnhart</u>, 395 F.3d 1168, 1173 (10th Cir.2005). Moreover, we have held that "[t]he ALJ is required to give controlling weight to the opinion of a treating physician as long as the opinion is supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record." <u>Hamlin</u>, 365 F.3d at 1215. If either of these requirements is not met, the ALJ is not required to give the opinion controlling weight but he must still decide whether to reject the opinion altogether or assign it some lesser weight. <u>Pisciotta</u>, 500 F.3d at 1077. If he rejects it, the ALJ "must articulate specific, legitimate reasons for his decision." <u>Hamlin</u>, 365 F.3d  at 1215 (quotation omitted). And if he merely assigns it a lesser weight, the ALJ must consider specific regulatory factors in doing so. These include, the length and nature of the treatment relationship, frequency of examinations, the degree to which the opinion is supported by relevant evidence, the opinion's consistency with the record as a whole, and whether the opinion is that of a specialist.  <u>Id.</u> n. 7; <i>see also</i> 20 C.F.R. § 404.1527(d)(2)-(6).

<u>Taylor v. Astrue</u>, 266 F. App'x, 771, 776 (10th Cir. Feb 22, 2008).  The ALJ did not reject the opinions of Dr. Quay and Dr. Schwartz in their entirety but he did afford them minimal weight

without any discussion of the length and nature of the treatment relationship, the frequency of examinations, the degree to which their opinions were supported by relevant evidence, the opinion's consistency with the record as a while or whether the opinions were those of a specialist.  For purposes of providing a meaningful review, an ALJ is not required to specifically discuss the factors.  Id. at 777.  However, here, based on a review of the record, it is difficult to determine what evidence the ALJ relied on in reaching his decision.

The ALJ's brief explanation of why he assigned minimal weight to the treating physicians' opinions actually gave the appearance of rejecting the physicians' opinions altogether.  A treating physician's report can be rejected "if it is brief, conclusory and unsupported by medical evidence" or is "not supported by specific findings."  Castellano v. Sec. of Health and Human Servs., 26 F.3d 1027, 1029 (10th Cir. 1994).  However, the opinions and records of Dr. Quay and Dr. Schwartz are not brief, conclusory or unsupported by medical evidence.

Notwithstanding the treatment provided by Dr. Quay and Dr. Schwartz, along with their numerous letters in support of Basso, the ALJ speculated first that the letters written by Dr. Quay and Dr. Schwartz were prepared at the claimant's attorney's request. [Tr. 16.] While it may be correct that Ms. Basso or her attorney requested letters in support of the application, it does mean that the doctors' opinions are contrary to the medical evidence.  However, the ALJ gave minimal weight to one of Dr. Quay's letters based on what he perceived to be evidence that Dr. Quay believed Basso's condition was only temporary. [Tr. 16.] Although Dr. Quay hoped Basso's condition was temporary, the records indicate that the doctor's hopes were unrealized as her symptoms worsened.  This is confirmed by testing results and examinations by Dr. Schwartz.

So, too, little weight was afforded Dr. Schwartz's letters and opinions.  The ALJ concluded that the opinion was inconsistent with the doctor's decision to release Basso to return to work in

36

April 2005.  As earlier noted, the idea of having Basso return to work came from Basso.  Moreover, the reason she did not return to work, as documented in Dr. Schwartz's medical records and examinations, is because her pain and condition worsened.

It is also significant that the Public Employee Retirement Association ("PERA") concluded that Basso was totally disabled.  While such a finding is not conclusive on the fact-finder, it is relevant, if not compelling, evidence that should be considered.

The Court recognizes that a doctor's opinion of disability is an issue reserved to the Commissioner.  Thus, the ALJ was not compelled to accept the Dr. Quay's, Dr. Schwartz's or PERA physicians' opinions as to the ultimate issue of disability.  However, in examining the medical records as a whole, there is substantial evidence to support a contrary determination.

While an ALJ "may reject a treating physician's opinion outright," he may only do so "on the basis of contradictory medical evidence. . . ."  McGoffin v. Barnhart, 288 F.3d 1248, 1252 (10th Cir. 2002) (internal citations omitted).  Furthermore, the ALJ must discuss the uncontroverted evidence he did not rely upon in his decision and any significantly probative evidence that he rejects.  See Frantz v. Astrue, 509 F.3d 1299, 1303 (10th Cir. 2007).  There were many records documenting Basso's chronic and severe pain that were not discussed by the ALJ.  While it is not necessary to discuss each and every piece of evidence, the evidence relied on by the ALJ must fairly reflect the record as a whole.  Clifton, 79 F.3d at 1009-1010.

The only record that might support the ALJ's RFC finding is an RFC assessment completed by a non-examining physician. [Tr. 119.]  However, the ALJ did not reference this record in his decision, nor is the Court convinced that the reviewing physician's assessment alone would have provided substantial evidence to support the RFC findings, in view of the entire medical record.  The

Court concludes that a remand is appropriate so as to allow for a fuller examination and discussion of the evidence.

The Court will remand so that the ALJ can re-conduct step four of the sequential evaluation. The ALJ should evaluate Basso's physical impairments, along with any mental impairments she has. Because the Court a remand appropriate at phase one of step four, the later phases of step four may be compromised. Upon remand, the ALJ should make the necessary specific findings at each phase of step four, including, for example, the function-by-function analysis.

The ALJ need not engage in a formalistic factor-by-factor recitation of the evidence. Qualls v. Apfel, 206 F.3d 1368, 1372 (10th Cir. 2000). Findings of credibility, however, should be closely linked to substantial evidence. Kepler, 68 F.3d at 391. Without a proper assessment of the claimant's credibility regarding pain and the limitations it causes, there is an inadequate basis to determine, "whether, considering all the evidence, both objective and subjective, [c]laimant's pain is in fact disabling." Branum v. Barnhart, 385 F.3d 1268, 1273 (10th Cir. 2004) (internal citation omitted). Stated differently, the ALJ's RFC assessment would not be based on substantial evidence, without the requisite pain and credibility analysis.

## II.    CONSULTATIVE EXAMINATIONS

Although not expressly raised by Basso, the ALJ should consider whether a consultative mental or physical examination might be helpful. The record clearly references many of Basso's physical complaints. However, in addition, the Court noted a number of references in the medical records concerning Basso's alleged memory problems, depression, treatment for depression, depressed or tearful appearance, sad, flat affect, or depressed and despairing feelings. *See, e.g.,* Tr. 85, 87, 89, 90, 97, 107, 111, 134, 155, 157. Moreover, at step two, the ALJ found, in part, that Basso's depression was a severe impairment.

38

The ALJ "has broad latitude in ordering consultative examinations." <u>Hawkins v. Chater</u>, 113 F.3d 1162, 1166 (10th Cir. 1997).  Fur further examination to be required, there must be "some objective evidence in the record suggesting the existence of a condition [that] could have a material impact on the disability decision."  <u>Id.</u> at 1167.  Where the record medical evidence is inclusive, "a consultative examination is often required for proper resolution of a disability claim. <u>Id.</u> at 1166.

**<u>Conclusion</u>**

For all of the above stated reasons, the Court determines that Basso's motion to remand for a rehearing should be granted.

IT IS THEREFORE ORDERED that Plaintiff's motion to remand for rehearing [Doc. No. 13] is GRANTED and the case is REMANDED so that the ALJ can address the issues discussed herein.


_Lorenzo F. Garcia_
Lorenzo F. Garcia
Chief United States Magistrate Judge